IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDER GODWIN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT | : | |
| OF TRANSPORTATION, et al., | : | No. 19-4951 |
| Defendants. | : | |

**MEMORANDUM OPINION**

Timothy R. Rice                                                                                                                  January 31, 2022
U.S. Magistrate Judge

      Plaintiff Alexander Godwin alleges that Defendants Pennsylvania Department of Transportation and Pennsylvania Department of Transportation, Engineering District 8 (collectively, "DOT") violated his constitutional and state rights by maintaining a racially hostile work environment and retaliating against him when he complained about it. Def. Mem. (doc. 56); see also Am. Compl. (doc. 18). DOT seeks summary judgment on two racial discrimination claims based on 42 U.S.C. § 2000e et seq. ("Title VII") (Count II) and the Pennsylvania Human Rights Act, 43 Pa. C. S. § 951, et seq. ("PHRA") (Count III). See Am. Compl. ¶¶ 53-61). I will grant summary judgment for DOT on those claims because Godwin failed to pursue them within their applicable time limits. Because I have already entered default judgment on all claims brought against the individual defendants, the only issue that remains is assessing damages against those defendants. See 1/15/21 Order (doc. 41).

**I.**       **Legal Standard**

      Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence and any inferences from the evidence must be viewed in the light most favorable to the

non-moving party.  See Ray v. Warren, 626 F.2d 170, 173 (3d Cir. 2010).  If reasonable minds could conclude that there are sufficient facts to support a non-moving party's claims, summary judgment should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment should be granted only if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record.  Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

A plaintiff may bring a civil rights action under 42 U.S.C. § 1983 against any person who allegedly deprived the plaintiff of his federal constitutional rights while acting pursuant to state law.  See Kalina v. Fletcher, 522 U.S. 118, 123 (1997).  To establish a racially hostile work environment in violation of Title VII or the PHRA, Godwin must show harassing behavior "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  Frost v. City of Philadelphia, 839 F. App'x 752, 758 (3d Cir. 2021); Vance v. Ball State Univ., 570 U.S. 421, 427 (2013) ("Title VII prohibits the creation of a hostile work environment") (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Hoy v. Angelone, 691 A.2d 476, 480 (Pa. Super. Ct. 1997) ("In interpreting the PHRA, Pennsylvania courts may look to federal court decisions interpreting Title VII[.]").  To prevail on a claim of constructive termination, Godwin must establish "working conditions so intolerable that a reasonable person would have felt compelled to resign."  Pennsylvania State Police v. Suders, 542 U.S. 129, 146-47 (2004).  To prove that he was retaliated against, Godwin must demonstrate that he (1) undertook a protected activity; (2) suffered an adverse employment action; and (3) can prove a causal link.  See Collins v. Kimberly-Clark Pennsylvania, LLC, 247 F. Supp. 3d 571, 596 (E.D. Pa. 2017), ("[Title VII's] retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Godwin must also show that he filed a charge with the Equal Employment Opportunity Commission ("EEOC") within the applicable statutes of limitations. His Title VII claims are subject to a 300-day statute of limitations. Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000); Kunwar v. Simco, 135 F. Supp. 2d 649, 655 (E.D. Pa. 2001) (citing 42 U.S.C. § 2000e-5(e)). His PHRA claim has a 180-day statute of limitations. 43 Pa. C.S. § 959(a), (h).

## II.     Facts Most Favorable to Godwin

Godwin, an African American man, began working for DOT on November 10, 2014. Pl. St. of Facts ("SOF") (doc. 55-1) ¶ 1. During his employment, Godwin suffered increased anxiety and distress. Id. ¶¶ 34-35. Historically and currently, few DOT employees are African American. Id. ¶ 18. DOT employees can change work locations and supervisors every six months, depending on their seniority and their assignments, because they must "bid" for DOT work assignments every six months. Def. SOF (doc. 50), Ex. 1, Godwin Dep. (doc. 50-1) at 18-19. Id. Locations, also known as a "toolboxes," are staffed by Transportation Equipment Operators, like Godwin, and supervised by foremen and assistant foremen. See, generally, Def. SOF, Ex. 23, Investigative Report (doc. 50-23). At the Herrville toolbox, where the three 2018 incidents cited in Godwin's Amended Complaint occurred, Godwin's immediate supervisor was Foreman Travis Amspacher; Amspacher's immediate supervisor was Assistant Highway Maintenance Manager Barry Weissman. Def. SOF, ¶ 5, Ex. 8, Amspacher Dep. (50-8) at 10; Investigative Report at 3.

On May 17, 2018, DOT issued an Equal Employment Opportunity ("EEO") policy applicable to all its locations. Def. SOF, Ex. 3 DOT Equal Employment Opportunity policy (doc. 50-3). DOT employees receive the EEO policy annually, and it is posted in all DOT

locations. Def. SOF, ¶¶ 7, 17. DOT employees are also given diversity training.[1] Id. ¶ 17; see also Def. SOF Exs. 10-12 at 3-4 (training transcripts showing all three employees involved in the underlying 2018 incidents received diversity training in April 2019 and two of the three employees received another diversity training in late 2016/early 2017).

To show the same harassment he experienced was pervasive throughout the DOT workplace, which is comprised of different locations with rotating staff and supervisors, Godwin cites testimony of two other former DOT employees.

- Bruce Brown, an African American man who worked at DOT from 2005 or 2006 through 2011, Def. SOF ¶ 69, testified that his colleagues and two of his foremen regularly used the n-word, including Diane Weaver, who was then and is now the president of the DOT employees' labor union, see Def. SOF, Ex. 31, Brown Dep. (doc. 50-31) at 7-8, 14, 39, 42. Brown complained that he was denied opportunities afforded white colleagues and that his complaints of racism were ignored by Human Resources. Def. SOF, Ex. 31, Brown Dep. (doc. 50-31) at 7-8, 14, 39, 42. He was ultimately fired for fighting with a colleague whom he claims had provoked him by using the n-word, and unsuccessfully sued DOT for racial discrimination. Def. SOF ¶¶ 13; Brown Dep. at 11.

- William Rivera, a Hispanic man who worked at DOT from 2013 through May 2017, Pl.

---

[1] Although DOT asserts all its employees are given annual diversity training, its training transcripts do not support this claim. Compare Def. SOF ¶ 17, with Exs. 10-12. Amspacher testified that only supervisors are given annual diversity training. Amspacher Dep. at 14-15. Human Resources specialist Jennifer Leber testified that some information about racial discrimination is covered in DOT's new employee orientation training, and that the process of filing a complaint is covered in its sexual harassment training. Leber Dep. at 32-40. Sexual harassment training, however, does not appear to be provided annually. Def. SOF Exs. 10-12. Only one of the three employees ever received the new employee orientation training, and the other trainings Leber mentioned as potentially covering diversity issues, "PLAS" and "LSO," do not appear in any of the training transcripts.

SOF ¶ 24, testified that he and two African-American colleagues received unwarranted negative performance reviews from supervisors, including one supervisor with visible white supremacist tattoos, that he was passed over for promotion, and that his supervisor ignored his complaints, Def. SOF, Ex. 31, Rivera Dep. (doc. 50-31) at 4, 25, 32, 40-41. He conceded that his supervisor was reprimanded after he complained to Scott Tanguay, a senior supervisor who is white. Id. at 33. Rivera testified that, two weeks after he filed a discrimination complaint against DOT, he was fired on false pretenses and that Michelle Jennings of Human Resources offered to re-hire him if he dropped his discrimination complaint. Id. at 11-12. Instead, the union helped Rivera negotiate a settlement of his claims for $15,000. Id. at 13.

Godwin has no first-hand knowledge of Brown's or Rivera's experiences.

Union President Diane Weaver, who had no supervisory power over Godwin but worked with him, admitted that she repeatedly used the n-word outside Godwin's presence in 2016, in reference to a specific sign used in her work.[2] Pl. SOF ¶ 4; Weaver Dep. (doc. 50-9) at 9-10. When reprimanded by a foreman, Weaver explained that she had learned the terminology from two other foremen. Def. SOF, Ex. 9, Weaver Dep. at 9-10. Her foreman instructed Weaver to stop using it. Def. SOF, Ex. 21, Witness Statement of Jacob Enoch (doc. 50-21) at 5; Investigative Report at 10. When she did not, the foreman reported her to his supervisor, who also instructed her to stop and threated discipline if her conduct persisted. Id.

Between 2014 and 2017, two other colleagues used the n-word in Godwin's presence but not referring to him. Pl. SOF. ¶¶ 9-10, Ex. N (doc. 55-16) at 1; Reply Ex. D, Pl. Interrogatory

---

[2] Weaver explained that she called a divider sign the "n boy sign" because that was how she was taught to refer to it by two of her supervisors. Weaver Dep. at 9-10, 24.

Resp. (doc. 56-4) at 7, 10; see also Godwin Dep. at 50, 57.  One of Godwin's foremen was present for one instance.  Godwin Dep. at 55-57.  Godwin testified he was also told, when he spoke with colleagues about potentially obtaining a promotion, that it would not be possible if senior supervisor Scott Tanguay, who is white, was in charge.  Id. at 229.  Godwin testified he unsuccessfully applied to become a working foreman.  Id. at 232.

In 2018, Godwin's colleagues made three racially offensive remarks, prompting Godwin to complain to Human Resources.  One white colleague, Robert Coldren, told Godwin he had been hired because he was a "token."  Pl. SOF ¶ 7.  In September 2018, another white co-worker, Daniel Bowers, used the n-word to describe a video he was watching on his phone.  Id. ¶ 8.  Although Bowers was not addressing Godwin, Godwin was so upset that he left work early.  Id.  A few days later, Weaver asked Godwin the meaning of a phrase containing the n-word.  Id. ¶ 4.

On September 26, 2018, Godwin asked his white supervisor, Amspacher, if he could speak with the workers at his location during their regular morning meeting.  Def. SOF ¶ 32.  Amspacher agreed, and at the meeting Godwin discussed the three 2018 racist incidents and demanded letters of apology.  Id.  Bowers was not present at the meeting, but Weaver provided an apology letter and Coldren declined to do so.  Godwin Dep. at 122.  Amspacher reported Godwin's complaints to Weissman, who told Godwin he needed to complete a witness statement if he wanted to file a discrimination complaint with Human Resources.  Def. SOF ¶ 33, Inv. Rep. at 14.  Weissman also later informed his supervisor, Tanguay, who had been on leave, about Godwin's complaints.  Inv. Rep. at 14.  Godwin later filed a written complaint directly to Tanguay.  Id.

Within several days of Godwin's morning meeting, an equal employment opportunity specialist in DOT's Human Resources department, Jennifer Leber, contacted Godwin to obtain a

formal written complaint, as required by DOT policy. Def. SOF ¶ 34. After receiving the complaint, Human Resources employee Angela Kreiser interviewed potential witnesses. Id. ¶ 42; Ex. 7, Leber Dep. at 15-16. One of the witnesses told Kreiser the n-word was widely used at DOT worksites and that two recently retired foremen used the term regularly. Inv. Rep. at 12 (summary of Hastings interview). Another stated that he had heard the word used but not addressed to an individual. Id. at 15 (summary of Chapman interview). Tanguay stated that he had disciplined employees when he learned of racist incidents in the past. Id. at 14.

After Kreiser finished the interviews, Leber, working with another colleague, drafted an Investigative Report that addressed four allegations: (1) Coldren calling Godwin a "token"; (2) Bowers using the n-word; (3) Weaver using the n-word; and (4) a racially hostile work environment. Id. at 4, 6-8; Leber Dep. at 15-16. The report did not include information obtained from interviews with the individuals whom Godwin alleges used the n-word in his presence before 2018 or the individuals he alleged witnessed those incidents. See Godwin Dep. at 50, 53, 57 (identifying uses of the n-word by two colleagues and witnesses to those incidents).

In August 2019, Human Resources personnel issued recommendations about Godwin's allegations. Leber Dep. at 18-20. Although DOT also drafted a letter to Godwin that included a copy of the Investigative Report and explained how to appeal the report's findings, Godwin never received the letter or report.[3] Def. SOF ¶ 43; Godwin Dep. at 178-80. The letter stated that "appropriate action" would be "taken to address matters and prevent recurrence." Def. SOF Ex. 24 (8/28/19 letter to Godwin from PA Office of Administration).

---

[3] DOT disputes Godwin's assertion that he never received the letter and report, but I must view the facts in the light most favorable to Godwin and assume he did not receive it. See Ray, 626 F.2d at 173.

7

After this recommendation, DOT's Labor Relations division conducted its own investigation, using the Investigative Report and pre-disciplinary conferences it held with the three colleagues accused of wrongdoing. Def. SOF ¶¶ 46-47; see also id. at Exs. 22, 25, 26 (notes from pre-disciplinary conferences in September and November 2019). Another division, the Office of Administration, formally issued the disciplinary actions against the three employees in November 2019. Id. ¶¶ 49-51. Weaver received a Level II Alternative Discipline in Lieu of Suspension. Id. ¶ 49. Her disciplinary notice stated that "any future incident of the same or similar nature" would result in termination. Id. Coldren was issued a written reprimand, noting that "any future incident of the same or similar nature will result in further disciplinary action, up to and including termination." Id. ¶ 50. Bowers was issued a counseling session and provided another copy of DOT's EEO policy. Id. ¶ 51. In April 2019, all DOT employees, including Weaver, Coldren, and Bowers, attended in-person diversity training. Id. ¶ 18; see also Def. SOF Exs. 10-12 (training transcripts for Weaver, Coldren, and Bowers), at 3.

On November 7, 2018, Godwin interviewed for a construction job with the City of Lancaster. Am. Compl. ¶ 54-55. He listed DOT manager Joe Saits as a reference. Id. ¶ 54. When contacted to provide a reference for Godwin, Saits said that he had worked with Godwin for only one week and could not provide a reference.[4] Def. SOF, Ex. 30, Ludgate Dep. at 13.

---

[4]  Godwin characterizes this reference as "bad," claiming that Robert Ludgate, who was responsible for hiring for the position, told him he did not get the job because Saits had given him a bad reference. Godwin Dep. at 201. Ludgate denied characterizing Saits's reference as bad. Id. at 19. He explained he had told Godwin to check with people before offering them as references to avoid surprising people. Id. at 18-20. Godwin's testimony about Ludgate's statement to him is inadmissible hearsay. Fed. R. Evid. 802. Even viewing the facts in the light most favorable to Godwin, I find the only admissible evidence of this exchange is Ludgate's testimony that he did not tell Godwin he lost the job because of a bad reference but that the candidate who was hired had more construction experience, more government experience, and the ability to speak two languages. See Rosati v. Colello, 94 F. Supp. 3d 704, 714-18 (E.D. Pa.

Ludgate testified that a bilingual applicant with more construction and government experience was hired over Godwin. Ludgate Dep. at 18.

In November 2018, Godwin was injured in a car accident while working for DOT, rendering him unable to continue working as a Transportation Equipment Operator. Def. SOF ¶ 2; Godwin Dep. at 15. DOT has not offered him a light duty position. Godwin Dep. at 28. Godwin testified he will not return to DOT until he is satisfied it has addressed its racist work environment problems. Id. at 208. In April 2019, DOT conducted a mandatory, in-person diversity training for all DOT employees. Def. SOF ¶ 18. Godwin filed his EEOC charge on July 31, 2019. Reply Ex. 1 (doc. 56-1) (EEOC form dated 7/31/2019).

**III.    Discussion**

DOT argues that it is entitled to summary judgment because the last racist incident Godwin experienced was on September 24, 2018, more than 300 days before he filed his claim with the Equal Employment Opportunity Commission on July 28, 2019. Def. Mem. at 16. Godwin argues that his claims are timely because the events are part of a "continuing violation" that extended into the 300-day window. See Pl. Mem. at 6.

Under the "continuing violation" doctrine, a hostile work environment claim is timely if at least one of the identified incidents occurred within the limitations period. See Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) ("when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period"). Godwin posits three separate theories to bring all of his claims within the statute of limitations based on the "continuing violation" doctrine: (1) Human

---

2015) (dismissing claims of discrimination, retaliation, and hostile work environment that were supported only by plaintiff's testimony and inadmissible hearsay).

9

Resources' investigation from October 2018 through August 2019 was a discriminatory event because it did not take into account Weaver's 2016 incident; (2) DOT constructively discharged Godwin after November 2018 by not offering him a light-duty position after he was injured in the car accident; and (3) DOT retaliated against Godwin in November 2018 by giving him a bad reference.[5]  Pl. Mem. at 6.

Godwin's first argument fails because the undisputed evidence viewed in the light favorable to him shows that Human Resources considered Weaver's 2016 incident when investigating his complaint from October 2018 through August 2019.  See Inv. Rep.; 8/28/19 Letter.  Godwin contends that Kreiser, the Human Resources employee who conducted the interviews, testified that she did not consider Weaver's 2016 statements. Pl. Mem. at 13 (citing Kreiser Dep. at 31).  He notes that, although Kreiser testified DOT maintains a zero-tolerance policy against racism, id. at 31, she also said DOT has no rule requiring automatic termination if an employee is disciplined more than once for uttering the n-word, id. at 36, and that she considers the length of time between incidents as a mitigating factor when determining discipline, id. at 37.  Finally, Godwin cites Kreiser's testimony that she was not required to ask Weaver about the 2016 incident during her investigation of the 2018 incident.  Id. at 40.

The undisputed facts undermine Godwin's position. The Investigative Report includes summaries of Godwin's allegations regarding the 2016 incident as well as interviews about the 2016 incident with Weaver, Weaver's 2016 supervisor, her supervisor's supervisor, and several of her colleagues from that time.  Inv. Rep. at 8-12.  Further, Godwin ignores that Kreiser's

---

[5]  Godwin also notes that his § 1981 claim is subject to a two-year statute of limitations.  Pl. Mem. at 5.  The § 1981 claim, however, was brought only against the individual defendants.  Am. Compl. ¶¶ 40-52.  Its statute of limitations is therefore inapplicable to the claims brought against DOT.  See supra n.1.

10

interviews were only the first of multiple steps by DOT in conducting its investigation. After Kreiser completed her interviews, others (1) compiled the information into the Investigative Report; (2) which was then considered by equal employment specialists who made recommendations; (3) which were considered by the Labor Relations department in coordination with the union when determining what disciplinary and other corrective actions would be taken. Leber Dep. at 18-20; Def. SOF ¶¶ 43, 46-47, 49-51; Def. SOF Ex. 24 (8/28/19 letter to Godwin from PA Office of Administration).

Finally, Weaver received the most severe discipline of the three offenders. Compare Def. SOF ¶¶ 49-51 (showing Weaver's discipline, unlike her colleagues', requires termination if there is another, similar incident). Her disciplinary notice warned that she will be fired if she is involved in another incident of racial bias. Id. ¶ 49. By providing a clear and easily accessible mechanism for lodging a complaint, undertaking a thorough and objective evaluation of that complaint, and issuing reasonable discipline based on the investigation's findings, DOT met its legal obligations. See Peace-Wickham v. Walls, 409 F. App'x 512, 519 (3d Cir. 2010) ("Importantly, even if a remedial action does not effectively end the alleged harassment, it may still be legally 'adequate' if it was 'reasonably calculated' to do so."); Dunlap v. Boeing Helicopter Div., No. 03-2111, 2005 WL 435228, at *8 (E.D. Pa. Feb. 23, 2005) ("An employer, in order to avoid liability for the discriminatory conduct of an employee, does not have to necessarily discipline or terminate the offending employee as long as the employer takes corrective action reasonably likely to prevent the offending conduct from reoccurring.") (citing Knabe v. The Boury Corp., 114 F.3d 407, 414 (3d Cir.1997)). The Human Resources investigation fails to constitute evidence of a continuing violation by DOT.

Godwin's argument that the hostile environment at DOT continued because of DOT's

ongoing failure to offer him a light duty position also fails. First, Godwin offers insufficient evidence to establish a constructive termination claim. He remains employed by DOT. Def. SOF ¶ 61; Pl. Resp. Facts (doc. 55-2) ¶ 61; Reply Ex. D at 12 (Interrogatory #16 noting "Plaintiff is still employed by PennDOT"). He thus fails to meet a necessary element of a constructive termination claim: no longer working for the defendant. See Green v. Brennan, 578 U.S. 547, 554 (2016) ("in the context of a constructive-discharge claim, a resignation is part of the 'complete and present cause of action'"). Nor has he offered any evidence that he sought a light-duty position. Fogleman v. Greater Hazleton Health All., 122 F. App'x 581, 585 (3d Cir. 2004) (upholding judgment for defendants based on finding that plaintiff had "failed to demonstrate that she requested accommodations or assistance for her disability"). Finally, Godwin testified that his reason for not returning to work was based on the workplace environment, not the lack of a light-duty position. Godwin Dep. at 208. Godwin cannot rely on the constructive termination theory to revive his untimely hostile work environment claim by simply refusing to return to work. See also Mercer v. SEPTA, 608 F. App'x 60, 63 (3d Cir. 2015) (a "reasonable accommodation request is a one-time occurrence rather than a continuing practice, and therefore, does not fit under the continuing violations theory").

      Godwin also argues that the hostile work environment continued into November 2018, when a DOT supervisor gave him a negative job reference. Pl. Mem. at 6. His claim fails. First, incidents that are actionable on their own, like specific retaliatory actions, cannot serve as the basis for a continuing violation theory. "Discrete acts such as termination, failure to promote . . . and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice' [that must have] 'occurred' within the appropriate time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (distinguishing between discrete,

independently actionable claims with their own time limits and continuing violations that can include otherwise untimely claims).

Second, the only admissible evidence shows Godwin was not given a bad reference. See supra n.4. Godwin argues that because he and Ludgate have different versions of what happened, the jury must resolve this factual dispute. Pl. Mem. at 19-20. But this is not a case where the employer and employee have different versions of events; in those cases, the defendant's alleged words constitute a party admission and admissible hearsay, which allows the jury to resolve credibility. See Fed. R. Evid. 801(d)(2); United States v. Rodriguez, 160 F. App'x 246, 248 (3d Cir. 2005) ("credibility judgments [are] for the jury alone"). Ludgate is a third party, rendering Godwin's testimony of Ludgate's out-of-court statements inadmissible hearsay. Fed. R. Evid. 802. A factual dispute based entirely on inadmissible hearsay evidence is insufficient to preclude summary judgment. Rosati v. Colello, 94 F. Supp. 3d 704, 714-18 (E.D. Pa. 2015)

An appropriate order follows.